1

2

3

4

5

6                      IN THE UNITED STATES DISTRICT COURT FOR THE

7                          EASTERN DISTRICT OF CALIFORNIA

8

9  CFM COMMUNICATIONS, LLC          )        No. CV-F-04-6111 REC DLB
                                    )
10             Plaintiff,           )        ORDER GRANTING IN PART AND
                                    )        DENYING IN PART DEFENDANT'S
11        vs.                       )        MOTION FOR SUMMARY JUDGMENT
                                    )        OR, IN THE ALTERNATIVE,
12  MITTS TELECASTING COMPANY,      )        SUMMARY ADJUDICATION.
                                    )
13             Defendant.           )        (Doc. 8)
                                    )
14  _____ )

15        On March 7, 2005, the Court heard Defendant's motion for

16  summary judgment or summary adjudication.  Upon due consideration

17  of the written and oral arguments of the parties and the record

18  herein, the Court GRANTS IN PART and DENIES IN PART the motion as

19  set forth below.

20  **I.   Factual Background**[1]

21        This case centers around the ownership of and purchasing

22  rights to television station KXVO(TV)[2] Channel 15 in Omaha,

23  Nebraska (the "Station").  As of January, 2000, the Station had

24  _____

25        [1] The facts are taken from MTC's Statement of Undisputed
    Material Facts ("UMF") unless otherwise noted.
26        [2] KXVO(TV) was formerly known as KPQC(TV).

                                    1

an appraised value of $18,750,000.  To summarize, Plaintiff CFM
Communications, LLC ("CFM" or "Plaintiff") claims that it has a
valid purchase option contract for the Station.  Defendant Mitts
Telecasting Company ("MTC" or "Defendant") argues that the option
contract is unenforceable.

Pappas Telecasting of the Midlands ("Pappas" or "PTM")
purchased the FCC construction permit for the Station from the
original grantee.  Pappas Decl. ¶ 2.  The purchase was on the
condition that Pappas could build the Station but could not put
it on the air unless Pappas divested itself of another station it
owned in Omaha.  Id.  Pappas sold the FCC authorization to
construct and operate the Station to Gary M. Cocola ("Mr.
Cocola").

On November 4, 1994, Mr. Cocola executed a promissory note
in favor of Pappas in the amount of $410,000 (the "Cocola Note").
The Cocola Note provided that the holder could tender it to Mr.
Cocola and that all of Mr. Cocola's obligations would be
satisfied if (a) Mr. Cocola cooperated with the holder of the
Cocola Note in forming a limited partnership (the "Cocola Limited
Partnership") in which the holder would be the sole general
partner and own 97 percent of the equity of the Cocola Limited
Partnership and Mr. Cocola would be the limited partner and own
the remaining 3 percent of equity; and (b) Mr. Cocola would
transfer to the Cocola Limited Partnership, with the consent of
the FCC, all of Mr. Cocola's right, title and interest in KXVO,
including all FCC licenses, permits and authorizations.

2

1    The Cocola Note provided that, at any time after the Cocola
2 Limited Partnership was formed, the general partner (note holder)
3 could require the limited partner (Mr. Cocola) to convey his 3
4 percent interest to the general partner for a purchase price
5 equal to 3 percent of the then fair market value of the Station,
6 including the FCC license.  It also provided that the note could
7 be assigned by the holder at any time with notice to Mr. Cocola.
8    On or about November 5, 1999, Defendant MTC, of which Thomas
9 Mitts, M.D. ("Dr. Mitts") is the president and sole shareholder,
10 and Pappas executed two agreements, a "Note Power and Assignment"
11 and an "Option Agreement."  Under the Note Power and Assignment,
12 Pappas, for $425,000, sold and assigned to MTC the Cocola Note
13 and "all rights running to the holder thereof including, without
14 limitation, all rights of the holder to exercise the 97% Option
15 and the 3% Option."  The Note Power and Assignment defined "97%
16 Option" as "an option to acquire a 97% general partner interest
17 in a newly-formed limited partnership which will hold the [FCC]
18 licenses and certain other assets used in the operation of [the
19 Station]," and the "3% Option" as "an option, exercisable by the
20 holder of the Note, to acquire from Cocola a 3% limited partner
21 interest."
22    MTC paid $972,500 for the purchase of the Station; $410,000
23 to pay off the Cocola Note and the remaining $562,500 which was
24 the parties' calculation of the Cocola's 3% interest in the
25 Station.  As mentioned, the Station was valued at $18,750,000 at
26 the time.  Davis Decl. ¶ 4.  Pappas was to provide programming,

sales, and other services in connection with the operation of the Station pursuant to a Time Brokerage Agreement, which is not before the Court.  Davis Decl. ¶ 9.  Pappas also pays MTC's operating expenses including the cost of MTC's personnel at the Station, out of pocket expenses paid by MTC and government fees.[3] Davis Decl. ¶ 7.

The Option Agreement between MTC and Pappas, which is at the center of this case, defines the 97% and 3% options just as the Note Power and Assignment does and provides a purchase option in favor of Pappas as follows:

> (a) MTC hereby grants to Pappas or its assignee an exclusive and irrevocable option (the "Purchase Option") as follows:
>
> (i) If, at the time the Purchase Option is exercised, MTC has not acquired any interest in the Partnership or the assets used in connection with the Station pursuant to the 97% Option or the 3% Option, then Pappas shall have the option to acquire from MTC the Note, including all of MTC's rights under the 97% Option and the 3% Option, for a price equal to $425,000, plus or minus the CPI Adjustment as defined below (the "Note Exercise Price"); or
>
> (ii) If, at the time the Purchase Option is exercised, MTC has acquired, pursuant to the 97% Option, the 97% general partner interest in the Partnership, but has not acquired the 3% limited partner interest in the Partnership, then Pappas shall have the option to acquire from MTC all of MTC's interest in the Partnership, plus MTC's rights under the 3% Option, for a price equal to $425,000, plus or minus the CPI Adjustment as defined below (the "Partnership Interest Exercise Price"); or

---

[3] MTC disputes that all of its expenses have been paid, but does not dispute that it receives a payment of $2,500 per month pursuant to its contracts with Pappas (and/or its assigns).  This dispute is immaterial.

1      (iii) If, at the time the Purchase Option is exercised,
       MTC has acquired, pursuant to the 97% Option and the 3%
2      Option, all of the FCC authorizations and other assets
       used by Cocola in the operation of the Station, then
3      Pappas shall have the option to acquire from MTC all of
       such authorizations and other assets for a price equal
4      to $425,000, plus the amount for with MTC acquired the
       3% interest in the Partnership from Cocola, plus or
5      minus the CPI Adjustment (the "Station Assets Exercise
       Price").

6

7   The Option Agreement provides that the purchase option is

8   exercisable for seven years after the effective date, on or about

9   November 5, 1999.  Mitts Decl. Ex. C at 4.  Pappas paid MTC

10  $12,000 as a non-refundable payment for the purchase option.  The

11  Option Agreement also provided a Put Option under which MTC or

12  its assignee could require Pappas to acquire MTC's interest in

13  the Partnership and / or Station assets.

14      On November 5, 1999, Pappas provided formal written notice

15  to Mr. Cocola that Pappas had assigned the Cocola Note to MTC.

16  On the same day, MTC formally exercised its option rights under

17  the Cocola Note by letter to Mr. Cocola.  The letter notified Mr.

18  Cocola that MTC was exercising the option and suggested that

19  counsel for both parties work to finalize a partnership agreement

20  in accordance with the terms of the Cocola Note.

21      Counsel for Mr. Cocola sent a letter dated November 10,

22  1999, to counsel for Pappas confirming receipt of the letters

23  regarding the assignment and the exercise of the option.  Also on

24  November 10, 1999, counsel for Pappas sent counsel for MTC a

25  memorandum including a draft of a partnership agreement.  On

26  November 19, 1999, counsel for Pappas sent an email to counsel

for MTC stating that Mr. Pappas had spoken to Mr. Cocola and Mr. Cocola was willing to sell the Station to MTC.  The message specified that Cocola "did not want to stay in as a 3% partner and Harry [Pappas], Tom [Mitts] and Gary [Cocola] think they can agree on a value for the station so that Mitts could by Cocola out completely eliminating the need for a partnership."

On December 1, 1999, counsel for Pappas sent Mr. Pappas an email, which was copied to counsel for MTC, confirming that Mr. Cocola and Mr. Pappas "had essentially agreed that it makes no sense to go through a two-step process whereby Cocola would be reduced to a 3% limited partner role, and then [require MTC buy him out]."  The email further confirmed that counsel for Cocola and Mr. Pappas "agreed just to have [MTC] take Cocola out as the owner of KXVO(TV) altogether, 100% in one single transaction."

On February 25, 2000, counsel for Pappas sent an email to counsel for MTC with a proposed Asset Purchase Agreement attached.  The proposed agreement did not discuss the 97% Option, the 3% Option, a limited partnership between Mr. Cocola and MTC or the Pappas Option.  Counsel for MTC provided counsel for Mr. Cocola and Pappas' Vice President and Chief Financial Officer Dennis Davis with a letter agreement, the final form of the agreement to be entered into between MTC and Mr. Cocola.

On April 10, 2000, counsel for MTC sent Mr. Davis the execution copy of the letter agreement so that Mr. Davis could arrange for Dr. Mitts to sign it on behalf of MTC.  On April 17, 2000, Dr. Mitts executed the letter agreement, which provided for

6

1  the sale of the Station's assets directly to MTC.

2      There were three conditions to the transaction between MTC

3  and Cocola.  The first was the FCC's approval of the assignment

4  of the license; this was obtained on June 13, 2000.  The second

5  was the written consent of Pappas to the assignment from Mr.

6  Cocola to MTC of two agreements between Mr. Cocola and Pappas; a

7  Time Brokerage Agreement by which Pappas provides programming for

8  the Station, and an Equipment Lease Agreement.  Written consent

9  was obtained on August 1, 2000.  The third was providing Mr.

10  Cocola with the Cocola Note marked "Paid and Canceled;" this was

11  done on August 3, 2000 when Mr. Davis faxed MTC a copy of the

12  Cocola Note so marked.  The transaction was finalized on August

13  4, 2000.

14      By letter dated February 10, 2003, counsel for MTC sent the

15  FCC a letter and a copy of the Option Agreement.  By letter to

16  MTC dated August 20, 2003, Pappas purported to exercise the

17  Pappas Option of the Option Agreement.  On February 20, 2004,

18  Pappas assigned its rights under the Option Agreement to

19  Plaintiff CFM for consideration of ten dollars cash as well as

20  other consideration.  Pappas Decl. Ex. E.  Pappas informed MTC of

21  the assignment by letter dated February 25, 2004.  CFM informed

22  MTC that it was exercising the Pappas Option of the Option

23  Agreement, also by letter dated February 25, 2004.  Sometime

24  thereafter, counsel for MTC informed CFM that the Option

25  Agreement was unenforceable.  Def.'s Reply to Pl.'s UMF No. 38.

26  ///

## II.   Procedural History

CFM filed its Complaint, which is based on diversity, on August 16, 2004.  The Complaint states three claims for relief. The first is for specific performance of the Option Agreement. CFM alleges that the Option Agreement is a valid contract and that MTC has breached it by refusing to agree to the option, including the purchase price.  CFM alleges that the parties waived the necessity of establishing a partnership or that, in the alternative, the asset purchase agreement constitutes a novation of the original transactions and became fully enforceable notwithstanding the absence of a partnership.  The second claim is in the alternative and is for breach of contract based on the Option Agreement.  The third claim seeks a declaration of the rights and liabilities of the parties under the Option Agreement.

MTC moved for summary judgment on October 14, 2004.  MTC argues that the Option Agreement became unenforceable after the agreement between MTC and Cocola was finalized.  MTC argues that formation of the Cocola Limited Partnership was a condition precedent to the Pappas Option being exercisable and that the Option Agreement became unenforceable when MTC acquired the Station without the formation of the Cocola Limited Partnership. MTC also argues that CFM's theories of novation and waiver fail as a matter of law and that CFM cannot assert estoppel.

///

///

**III.  Discussion**

    **A.  Legal Standard**

    Summary judgment is proper when it is shown that there exists "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.   A fact is "material" if it is relevant to an element of a claim or a defense, the existence of which may affect the outcome of the suit.  T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)). Materiality is determined by the substantive law governing a claim or a defense.  Id.  The evidence and all inferences drawn from it must be construed in the light most favorable to the nonmoving party.  Id.

    The initial burden in a motion for summary judgment is on the moving party.  The moving party satisfies this initial burden by identifying the parts of the materials on file it believes demonstrate an "absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).  The burden then shifts to the nonmoving party to defeat summary judgment.  T.W. Elec., 809 F.2d at 630.

    The nonmoving party "may not rely on the mere allegations in the pleadings in order to preclude summary judgment," but must set forth by affidavit or other appropriate evidence "specific

facts showing there is a genuine issue for trial." <u>Id.</u> (citing
Fed. R. Civ. P. 56(e)).  The nonmoving party may not simply state
that it will discredit the moving party's evidence at trial; it
must produce at least some "significant probative evidence
tending to support the complaint." <u>Id.</u> (citing <u>First Nat'l Bank
v. Cities Serv. Co.</u>, 391 U.S. 253, 290, 88 S. Ct. 1575, 20 L. Ed.
2d 569 (1968)).

**B.  Strict Construction & Condition Precedent**

An option contract is "an offer by which a promisor binds
himself in advance to make a contract if the optionee accepts
upon the terms and within the time designated in the option.
Since the optioner is bound while the optionee is free to accept
or not as he chooses, courts are strict in holding an optionee to
exact compliance with the terms of the option." <u>Bekins Moving &
Storage Co. v. Prudential Ins. Co.</u>, 176 Cal. App. 3d 245, 250-51
(1986) (strictly construing time in which party could exercise
option).

"A condition precedent is either an act of a party that must
be performed or an uncertain event that must happen before the
contractual right accrues or the contractual duty arises." <u>Platt
Pacific, Inc. v. Andelson</u>, 6 Cal. 4th 307, 313 (1993) (citing
Cal. Civ. Code § 1436; 1 Witkin, Summary of Cal. Law, Contracts §
722 p. 654).  A condition may be made express by the terms of the
contract or arise by implication.  1 Witkin, Summary of
California Law § 722.  Words of condition such as "if," "on
condition that," and "unless" may indicate an express condition.

10

8-31 Corbin on Contracts § 31.1 (Matthew Bender 2004).  The law
disfavors conditions precedent; "absent plain and unambiguous
contract language" creating such a condition, "courts shall not
construe a term of the contract so as to establish a condition
precedent." <u>Frankel v. Bd. of Dental Examiners</u>, 46 Cal. App. 4th
534, 550 (1996).

MTC argues that the terms of the Option Agreement must be
strictly construed and that its plain language indicates that the
formation of the Cocola Limited Partnership was a condition
precedent to the Pappas Option being exercised.  Because that
condition did not and cannot come to pass, the Option Agreement
is not enforceable.

CFM argues that "there is no plain, unambiguous language
suggesting that the formation of a limited partnership was a
condition precedent" to Pappas' right to enforce the option.
Pl.'s Opp'n at 9.  CFM claims that Pappas could acquire
substantially all of the Station's assets other than through the
Cocola Limited Partnership as follows:

> Whereas, MTC now desires to grant to Pappas an
> irrevocable option to acquire (i) the Note, (ii) the
> 97% interest in the partnership **or (iii) substantially
> all of the assets, including the FCC authorizations,
> used in the operation of the station**, as the case may
> be, on the terms and conditions set forth herein; . .
> ..

Pl.'s Opp'n at 9 (citing Pappas Decl. Ex. C) (emphasis in Opp'n).
Thus, CFM argues, the language in the Option Agreement regarding
the formation of the Cocola Limited Partnership was not a
condition precedent.

11

1    CFM is mistaken.  The relevant provision in the Option

2 Agreement[4] provides that:

> **If**, at the time the Purchase Option is exercised, MTC
> has acquired, pursuant to the 97% Option and the 3%
> Option, all of the FCC authorizations and other assets
> used by Cocola in the operation of the Station, **then**
> Pappas shall have the option to acquire from MTC all of
> such authorizations and other assets for a price . . ..

7 Pappas Decl. Ex. C (emphasis added).  The word "if" indicates a

8 conditional clause.  CFM's argument that the Option Agreement

9 provided for the acquisition other than through the Cocola

10 Limited Partnership is unavailing.  That clause, quoted <u>supra</u>,

11 specifies that MTC granted the option to acquire "substantially

12 all of the assets . . . on the terms and conditions set forth

13 herein."  Formation of the Cocola Limited Partnership is one of

14 the conditions "set forth herein."  The two provisions are not

15 inconsistent.

16    The Court agrees with MTC that the formation of the Cocola

17 Limited Partnership was a condition precedent to the exercise of

18 the Pappas Option.  Accordingly, summary adjudication as to this

19 issue is GRANTED.

20    **C.  Excuse of the Condition Precedent**

21    At oral argument on the motion CFM's counsel argued that the

22 condition precedent was excused because MTC caused the condition

23 _____

24    [4] As MTC points out, the other options are inapplicable.
Section (a)(i) contemplates no partnership having been formed but
grants an interest to Pappas in the Cocola Note, which was no
25 longer in existence when Pappas attempted to exercise the option.
Section (a)(ii) applies only if MTC had acquired the 97% interest
26 but had not yet bought out Cocola's 3%.

1   not to occur.

2      California courts have held that if a party "prevents or

3   makes impossible the performance or happening of a condition

4   precedent, the condition is excused." <u>Jacobs v. Tenneco West,</u>

5   <u>Inc.</u>, 186 Cal. App. 3d 1413, 1418 (1986); <u>see</u> <u>also</u> <u>Parsons v.</u>

6   <u>Bristol Dev. Co.</u>, 62 Cal. 2d 861, 869 (1965) (stating "a party

7   who prevents fulfillment of a condition of his own obligation . .

8   . cannot rely on such condition to defeat his liability").

9   Because this argument was raised by CFM for the first time at

10   oral argument, MTC has not had an opportunity to respond.  While

11   this theory may well have merit, the Court will not deny summary

12   judgment on this basis at this time as there are alternate bases

13   for the denial that have been fully briefed.

14      **D.  Waiver**

15      Given that the language in the Option Agreement created a

16   condition precedent, the next question is whether there is a

17   genuine issue of material fact regarding whether the condition

18   was waived when MTC bought Mr. Cocola's interest outright rather

19   than by forming the Cocola Limited Partnership.  The condition

20   specifies that if MTC, pursuant to the partnership, acquired all

21   the assets of the Station, then Pappas (or its assignee, CFM)

22   could acquire those assets as set forth in the option.  CFM

23   argues that MTC waived the requirement that the acquisition be

24   pursuant to the Cocola Limited Partnership.

25      "Waiver is the intentional relinquishment of a known right

26   after knowledge of the facts." <u>DRG/Beverly Hills, Ltd. v.</u>

13

1    <u>Chopstix Dim Sum Café and Takeout III, Ltd.</u>, 30 Cal. App. 4th 54,

2    59 (1994) (citing <u>City of Ukiah v. Fones</u>, 64 Cal. 2d 104, 107-08

3    (1966)).  The burden "is on the party claiming a waiver of a

4    right to prove it by clear and convincing evidence that does not

5    leave the matter to speculation, and 'doubtful cases will be

6    decided against waiver.'"  <u>Id.</u>  Waiver may, however, "be shown by

7    conduct; and it may be the result of an act which, according to

8    its natural import, is so inconsistent with the intent to enforce

9    the right in question as to induce a reasonable belief that such

10   right has been relinquished."  <u>Noel v. Dumont Builders, Inc.</u>, 178

11   Cal. App. 2d 691, 697 (1993) (quoting <u>Medico-Dental Bldg. Co. v.</u>

12   <u>Horton & Converse</u>, 21 Cal. 2d 411, 432 (1942)).  The issue of

13   waiver is a question of fact.  <u>Platt Pacific</u>, 6 Cal. 4th at 319.

14       MTC does not dispute that the "primary reason that the

15   partnership formality was dispensed with was to expedite payment

16   to Mr. Cocola since he no longer wanted to maintain an interest

17   in the station and its assets."  Def.'s Reply UMF No. 36.  MTC

18   argues, however, that CFM's waiver claim must fail because Dr.

19   Mitts never intended to waive MTC's right to enforce the

20   condition in the Option Agreement, essentially arguing that

21   because Dr. Mitts never considered his rights, he could not have

22   voluntarily relinquished them.  Dr. Mitts avers that:

23           At no time prior to August 20, 2003, did I consider
             whether purchasing the Station from Mr. Cocola in the
24           manner suggested and agreed to by Mr. Cocola and Harry
             Pappas, General Partner of Pappas Telecasting,
25           would affect the rights and obligations of Pappas Telecasting
             under the Purchase Option contained in the Option
26           Agreement or the rights and obligations of Mitts

                                    14

1      Telecasting under the Put Option contained in the
Option Agreement.

2

3      At no time prior to August 20, 2003, did anyone discuss
or even mention to me the possible effect on the

4      respective rights and obligations of Pappas Telecasting
under the Option Agreement if Mitts Telecasting
purchased the Station from Mr. Cocola in the manner

5      suggested and agreed to by Mr. Cocola and Mr. Pappas
after Mitts Telecasting and Pappas Telecasting entered

6      into the Option Agreement.

7   Mitts Decl. ¶¶ 19-20.  CFM points out that Dr. Mitts does not

8   state what his intent was at the time of the transaction.

9      MTC has carried its burden of demonstrating that Dr. Mitts

10   did not intend to waive his rights, although Defendant does not

11   address the contention that waiver may be found by conduct.  The

12   burden is on CFM to demonstrate a genuine issue of material fact.

13      CFM argues first that because Mr. Cocola could have insisted

14   on the formation of the Cocola Limited Partnership, the condition

15   was for the benefit of Cocola and could be waived by Cocola.

16   This is incorrect.  Mr. Cocola was not a party to the Option

17   Agreement and, as CFM acknowledges, "*a contracting party* may

18   waive conditions placed in a contract solely for that party's

19   benefit."  Pl.'s Opp'n at 10 (quoting <u>Sabo v. Fasano</u>, 154 Cal.

20   App. 3d 502, 505 (1984)) (emphasis added).  CFM cites no

21   authority for the proposition that a person not a party to the

22   contract, such as Mr. Cocola, may waive a provision thereof.

23      CFM next argues that the MTC waived the condition when it

24   agreed to the streamlined buyout process.  CFM asserts that there

25   is a dispute as to whether the parties discussed the impact of

26   the modified transaction on the Pappas Option.  In contrast to

1   Dr. Mitts' declaration, Mr. Pappas attests that he "did discuss

2   with Dr. Mitts that this change [in the manner of the transaction

3   with Mr. Cocola] would not affect the Pappas Option."  Pappas

4   Decl. ¶ 4.  Mr. Davis, the CFO of Pappas, avers that the intent

5   of Pappas to utilize the Pappas Option "was disclosed to and

6   discussed with Thomas Mitts during the negotiations that led to

7   PTM's consent to the 2000 transfer of Cocola's interest in the

8   station to MTC."  Davis Decl. ¶ 10.

9        MTC argues that these averments are too vague to demonstrate

10  a genuine issue of fact because Mr. Pappas does not state what he

11  claims he said to Dr. Mitts, what Dr. Mitts' response was, or

12  that Dr. Mitt's agreed to waive the provision.  MTC asserts that

13  because elsewhere Mr. Pappas avers that the parties "discussed

14  and agreed to bypass" the structure of the transaction delineated

15  in the Option Agreement, the failure of Mr. Pappas to use the

16  same language is telling.  MTC argues that the Davis Declaration

17  is similarly insufficient because it is conclusory.  MTC also

18  argues that the declarations are contradicted by counsel for

19  Pappas' averment that if anyone had suggested that the option was

20  or would be rendered ineffectual by the transaction it would have

21  been a "red flag issue for [him] that would have warranted an

22  immediate discussion, given the interests of Pappas Telecasting

23  that were at stake."  Johnson Decl. ¶ 5.

24       CFM argues that MTC's conduct indicates that MTC intended to

25  waive the condition.  CFM points out that counsel for MTC sent a

26  letter and a copy of the Option Agreement to the FCC.  The

16

letter, dated February 11, 2003, states the following:

> On behalf of Mitts Telecasting Company, licensee of
> Station KXVO(TV), Omaha, Nebraska, we are transmitting
> herewith a copy of an Option Agreement (with financial
> terms redacted) between the licensee and Pappas
> Telecasting of the Midlands, a California Limited
> Partnership.  The Option Agreement should be associated
> with the ownership file for Station KXVO(TV).

Whitney Decl. Ex. C.

Bearing in mind that the evidence is to be viewed in the light most favorable to CFM and that the issue of waiver is a question of fact, Platt Pacific, 6 Cal. 4th at 319, the Court finds that summary adjudication of this issue is inappropriate. The fault MTC finds with the declarations of Mr. Davis and Mr. Pappas goes to the weight to be given those statements, not their admissibility, and it is an issue for the trier of fact.  There is a dispute as to whether Dr. Mitt's was aware that the Option Agreement was to continue after the completion of the buyout and, in being so aware, whether MTC waived the formation of the Cocola Limited Partnership by its subsequent conduct.

Even if the Court were to ignore the declarations, MTC's subsequent sending of the letter to the FCC is conduct of which the "natural import" is that MTC believed that the Option Agreement was in full force at the time the letter was sent. This is inconsistent with an intent to enforce the condition and may indicate waiver.  Similarly, MTC did not assert that the Option Agreement was no longer valid when Pappas first notified MTC that Pappas was exercising the option in August of 2003; it was not until sometime in 2004 that Defendant asserted the

17

1    invalidity.  This is a second act of which the "natural import"

2    is inconsistent with an intent to enforce the condition.

3         Because there are genuine issues of material fact as to

4    whether the condition was waived, summary adjudication as to this

5    issue is DENIED.

6         **E.  Modification**

7         CFM argues in the alternative that, "at a minimum, the

8    option was modified to eliminate the partnership formation step

9    in identifying the price."  CFM asserts correctly that parties

10   are free to modify their contracts, including options.  See

11   Bergin v. Van Der Steen, 107 Cal. App. 2d 8, 13 (1951).[5]

12        Section 1698 of the California Code of Civil Procedure

13   governs the modification of written contracts.  It provides that:

14        (a) A contract in writing may be modified by a contract
         in writing.
15
         (b) A contract in writing may be modified by an oral
16       agreement to the extent that the oral agreement is
         executed by the parties.
17
         (c) Unless the contract otherwise expressly provides, a
18       contract in writing may be modified by an oral
         agreement supported by new consideration.  The statute
19       of frauds (Section 1624) is required to be satisfied if
         the contract as modified is within its provisions.
20
         (d) [omitted].
21

22   _____

          [5] The remainder of CFM's argument is off point.  CFM argues
23   that the Court must look to the intent of the parties in
     interpreting contracts, but the citations provided are to cases in
24   which courts essentially held that the intent of the parties is
     paramount where a contract is ambiguous on its face; there is no
25   such ambiguity alleged here.  Of the other cases cited by CFM, none
     deal with modification of a written contract and the procedure
26   therefor.

                                    18

Cal. Civ. Code § 1698.  Subsection (c) may apply here.  The
Option Agreement is silent as to the issue of modification and it
may have been orally modified if supported by consideration.

CFM argues that the parties agreed to streamline the process
by which Mr. Cocola could be bought out and thereby modified the
Option Agreement.  As discussed in the preceding section there is
a dispute as to whether the parties discussed the impact of the
modified transaction on the Pappas Option.  Additionally, conduct
of the parties that is inconsistent with the written contract may
"warrant the conclusion that the parties intended to modify the
written contract."  <u>Garrison v. Edward Brown & Sons</u>, 25 Cal. 2d
473, 479 (1944).  Again, as discussed, MTC included a copy of the
Option Agreement in a letter sent to the FCC in 2003 regarding
the "ownership file" of the Station.  Whitney Decl. Ex. C.  This
transmission indicates that MTC still believed that the Option
Agreement was in full force, thereby acknowledging that the
buyout did not terminate the Option Agreement.  The failure of
MTC to assert the invalidity of the Option Agreement for some
months is also consistent with modification.

Pappas' consent to the form of the buyout and agreeing to
the assignment of the Time Brokerage and Equipment Lease
Agreements may be consideration for the modification.  Indeed,
MTC notes that "Pappas Telecasting had the power to prevent the
closing unless the sale occurred on terms acceptable to Pappas
Telecasting."  Def.'s Mot. at 15.  Further, the Davis declaration
indicates that the continued viability of the Option Agreement

1  was paramount to Pappas' giving its consent to the buyout

2  transaction, which the parties agree was required.  <u>See</u> Davis

3  Decl. ¶¶ 3, 5, 10.

4       Again bearing in mind that the evidence on summary judgment

5  is to be viewed in favor of CFM, the Court finds that summary

6  adjudication of this issue is inappropriate.  CFM has presented

7  admissible evidence that tends to support its position that the

8  parties intended to modify the Option Agreement.

9       Because there are genuine issues of material fact regarding

10 the whether the Option Agreement was modified, summary

11 adjudication as to this issue is DENIED.

12      **F.  Estoppel**

13      Estoppel may apply where one party induces another to take a

14 position such that it would be injured if the first party is

15 allowed to repudiate its acts.  Equitable estoppel requires four

16 elements:

17      (1) The party to be estopped must know the facts;

18      (2) he must intend that his conduct shall be acted
         upon, or must so act that the party asserting the
19       estoppel had the right to believe it was so intended;

20      (3) the party asserting the estoppel must be ignorant
         of the true state of the facts; and,
21
22      (4) he must rely upon the conduct to his injury.

23 <u>DRG/Beverly Hills, Ltd. v. Chopstix Dim Sum Café and Takeout III,</u>

24 <u>Ltd.</u>, 30 Cal. App. 4th 54, 59 (1994).

25      Defendant argues that Plaintiff cannot establish the first

26 and third elements, which are, as Defendant puts it "two sides of

the same coin," because both it and Pappas were, at all time throughout their dealings, represented by counsel and that there is no evidence that indicates that Defendant was aware of facts of which Pappas, and thereby Plaintiff, was ignorant.  Def.'s UMF Nos. 14-21.  Defendant argues that the Option Agreement failed as a matter of law when the transaction occurred and the condition precedent failed.

Plaintiff does not directly address this issue but argues generally that "MTC takes the position the 1999-2000 transaction extinguished the Pappas Option.  Notably, MTC nowhere asserts it entertained this notion during the transaction in question.  Nevertheless, if it harbored such a belief, its failure to disclose it to PTM caused PTM to rely upon the continued enforceability of the option to its detriment, continually to the present."  Plaintiff further argues that it continued to pay the operating expenses for the station after the buyout in reliance on the continued viability of the Option Agreement.  Plaintiff asserts that "MTC achieved all this gain – an entire television station, free and clear – for literally nothing out of pocket.  *If it secretly held the belief the option was nullified in 2000, it misled PTM to its extreme financial detriment in failing to disclose that position at the time."*  Pl.'s Opp'n at 16-17 (emphasis added).

Pappas' failure to recognize the operation of law is not ignorance of the facts.  LaRue v. Swoap, 51 Cal. App. 3d 543, 552 (1975).  Moreover, as Defendant correctly argues, estoppel may

1  not be based on Defendant's silence regarding the effect of the

2  buyout of Mr. Cocola on the Option Agreement.  Under California

3  law, estoppel may be based on a party's silence only if that

4  party had a duty to speak, an opportunity to speak and knowledge

5  that the circumstances require him to speak.  Keeler v. Haky, 160

6  Cal. App. 2d 471, 478-79 (1958).  Plaintiff does not argue that

7  any such duty existed here and does not cite to any evidence that

8  contradicts Defendant's assertion that both parties were equally

9  aware of the facts and represented by adequate counsel

10 throughout.

11     As Plaintiff has failed to demonstrate a genuine issue of

12 material fact regarding the first and third elements of estoppel,

13 the fourth element, reliance, need not be addressed.

14 Accordingly, summary adjudication as to the issue of estoppel is

15 GRANTED.

16     **G.  Novation**

17     Defendant also argues that Plaintiff cannot, as a matter of

18 law, argue that there has been a novation because there has been

19 no substitution of a new agreement between Defendant and Pappas

20 for the Option Agreement.  Plaintiff does not address the

21 novation issue in its opposition.

22     Failure of a party to address a claim in an opposition to a

23 motion for summary judgment may constitute a waiver of that

24 claim.  Coufal Abogados v. AT&T, Inc., 223 F.3d 932, 937 (9th

25 Cir. 2000) (stating that where defendant raised issue in summary

26 judgment motion but where plaintiff did not address it to

district court, issue waived on appeal); <u>Doe v. Benicia Unified</u>
<u>Sch. Dist.</u>, 206 F. Supp. 2d 1048, 1050 n.1 (E.D. Cal. 2002)
(stating that "plaintiff abandons [her equal protection] theory
in her opposition to defendants' motion for summary judgment by
not mentioning it or citing any equal protection cases").

Even if Plaintiff had not waived the issue, which the Court
finds to the be case, the novation argument fails because there
is no evidence of a new contract that completely eliminated the
old one.  Accordingly, summary adjudication as to the issue of
novation is GRANTED.

**ACCORDINGLY**, Defendant's request for summary judgment is
hereby DENIED.

**FURTHER,** Defendant's request for summary adjudication as to
the issues of the existence of a condition precedent, estoppel
and novation is hereby GRANTED.

**FURTHER,** Defendant's request for summary adjudication as to
the issues of waiver and modification is hereby DENIED.


IT IS SO ORDERED.

**Dated:  May 3, 2005**                     **/s/ Robert E. Coyle**
ia40ij                               UNITED STATES DISTRICT JUDGE

23