IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| CFM COMMUNICATIONS, LLC, | ) | No. CV-F-04-6111 REC DLB |
| | ) | |
| Plaintiff, | ) | ORDER DENYING PLAINTIFF'S |
| | ) | MOTION TO STRIKE |
| vs. | ) | DESIGNATION OF DEFENDANT'S |
| | ) | EXPERT AND GRANTING IN PART |
| MITTS TELECASTING COMPANY | ) | AND DENYING IN PART |
| | ) | PLAINTIFF'S MOTION TO |
| | ) | EXCLUDE TESTIMONY OF |
| Defendant. | ) | DEFENDANT'S EXPERT AT |
| | ) | TRIAL.  (Doc. 67) |
| _____ | ) | |

On October 3, 2005, the Court heard oral argument regarding Plaintiff's Motion to Strike Designation of Defendant's Expert and to Exclude Testimony of Defendant's Expert at Trial.  Upon due consideration of the written and oral arguments of the parties and the record herein, the Court GRANTS IN PART and DENIES IN PART the motion as set forth below.

**I.   Factual Background**

Pappas Telecasting of the Midlands ("Pappas" or "PTM") held the FCC license for television station KXVO(TV) Channel 15 in Omaha, Nebraska.  Because current FCC regulations prohibit one owner from holding more than one license in any given area Pappas

has had to employ middlemen to "own" the station.  Gary Cocola held the station for Pappas from 1994 to 1999, during which time Pappas held a promissory note in its favor (the "Cocola Note"). The Cocola Note provided that the note holder could require Mr. Cocola to form a limited partnership with the note holder and that the note holder, who would be the general partner, could require Mr. Cocola to convey his interest in the station at any time with proper notice.

In 1999, Pappas assigned its interest in the Cocola Note to Defendant MTC via a "Note Power and Assignment."  The Note Power and Assignment gave MTC the right to force Mr. Cocola to form a limited partnership and then sell to MTC his share of the limited partnership, which would effectively result in MTC purchasing the Station.  MTC paid $972,500 for the assignment.

At the same time, Pappas also executed an "Option Agreement" with MTC.  The Option Agreement is the focus of this litigation. It provided for three scenarios by which Pappas could exercise a purchase option.  MTC had a put option that contained the same language, which is as follows:

(a) MTC [Defendant] hereby grants to Pappas or its assignee an exclusive and irrevocable option (the "Purchase Option") as follows:

(i) If, at the time the Purchase Option is exercised, MTC has not acquired any interest in the Partnership or the assets used in connection with the Station pursuant

to the 97% Option or the 3% Option, then Pappas shall have the option to acquire from MTC the Note, including all of MTC's rights under the 97% Option and the 3% Option, for a price equal to $425,000, plus or minus the CPI Adjustment as defined below (the "Note Exercise Price"); or

(ii) If, at the time the Purchase Option is exercised, MTC has acquired, pursuant to the 97% Option, the 97% general partner interest in the Partnership, but has not acquired the 3% limited partner interest in the Partnership, then Pappas shall have the option to acquire from MTC all of MTC's interest in the Partnership, plus MTC's rights under the 3% Option, for a price equal to $425,000, plus or minus the CPI Adjustment as defined below (the "Partnership Interest Exercise Price"); or

(iii) If, at the time the Purchase Option is exercised, MTC has acquired, pursuant to the 97% Option and the 3% Option, all of the FCC authorizations and other assets used by Cocola in the operation of the Station, then Pappas shall have the option to acquire from MTC all of such authorizations and other assets for a price equal to $425,000, plus the amount for which MTC acquired the 3% interest in the Partnership from Cocola, plus or

3

1   minus the CPI Adjustment (the "Station Assets Exercise

2   Price").

3

4   The Option Agreement provides that the purchase option is

5   exercisable for seven years after the effective date, on or about

6   November 5, 1999.

7       After the assignment was completed, MTC notified Mr. Cocola

8   of its intent to exercise its rights under the Cocola Note such

9   that the limited partnership would be formed and then MTC would

10  exercise its right to compel Mr. Cocola to sell his interest,

11  approximately 3% to MTC.  The partnership was never formed and

12  Mr. Cocola separately conveyed his interest in the station to

13  MTC.  One of the conditions of the single step transaction was

14  the approval of Pappas, which was given.  The transaction was

15  finalized on August 4, 2000.

16      In August of 2003, Pappas sent a letter to MTC purporting to

17  exercise the purchase option.  In February of 2004, Pappas

18  assigned its rights under the Option Agreement to Plaintiff CFM.

19  Sometime after MTC was notified of Pappas' assignment, MTC

20  informed CFM that the Option Agreement was unenforceable.  The

21  station has an appraised value of approximately $18 million.

22      The case is set for trial on November 8, 2005.  Joint

23  Pretrial Statement at 1.  CFM and MTC have withdrawn their

24  demands for a jury trial.  Joint Pretrial Statement at 2.

25  ///

26  ///

4

## II.   The Current Motion

CFM moves to strike the designation of Dennis P. Corbett as an expert, to strike his expert report, and to exclude his testimony at trial.  CFM argues that 1) Mr. Corbett's expert report (the "Report") features improper legal conclusions, 2) the Report is irrelevant because the issue of FCC approval is not before the Court, and 3) the FCC, not the district court, has exclusive authority to decide an applicant's qualifications.

MTC argues in response that 1) Mr. Corbett's testimony is relevant, 2) Mr. Corbett will not offer improper legal conclusions, and 3) Mr. Corbett will not invade the Court's role as sole arbiter of the law.

## III. Legal standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The district court acts as a "gatekeeper" and preliminarily determines whether the expert testimony is reliable and whether the methodology can be applied to the facts of the case and is relevant to the task at hand.  Daubert v. Merrell Dow Pharms.,

5

509 U.S. 579, 582, 592-93, 125 L. Ed. 2d 469, 113 S. Ct. 2786 (1993).  Pursuant to Federal Rule of Evidence 104(a), the proponent of expert testimony bears the burden to establish admissibility by a preponderance of proof.  Daubert, 509 U.S. at 592 n. 10 (citing Bourjaily v. U.S., 483 U.S. 171, 175-76, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987)).

To the extent CFM seeks a final determination of the admissibility of all or part of Mr. Corbett's testimony, what it offers is a definitive motion in limine.  See 21 Charles Alan Wright & Kenneth W. Graham, Jr., Federal Practice and Procedure § 5037.10 (2d ed. 2005).  Federal Rule of Evidence 103 empowers a court to make "a definitive ruling on the record admitting or excluding evidence, either at or before trial."  A pretrial motion in limine forces a court to decide the merits of introducing a piece of evidence without the benefit of the context of trial.  Id.; see United States v. Marino, 200 F.3d 6, 11 (1st Cir. 1999) (recognizing that proffered evidence can be more accurately assessed in the context of other evidence).  Regardless of a court's initial decision on a motion in limine it may revisit the issue at trial.  See Fed. R. Evid. 103 advisory committee's note to 2000 Amendment ("Even where the court's ruling is definitive, nothing in the amendment prohibits the court from revisiting its decision when the evidence is to be offered."); Luce v. United States, 469 U.S. 38, 41-42, 83 L. Ed. 2d 443, 105 S. Ct. 460 (1984) ("[E]ven if nothing unexpected happens at trial, the district judge is free, in the exercise of

sound judicial discretion, to alter a previous *in limine*

ruling.")   "The Supreme Court has recognized that a ruling on a

motion *in limine* is essentially a preliminary opinion that falls

entirely within the discretion of the district court."   United

States v. Bensimon, 172 F.3d 1121, 1127 (9th Cir. 1999) (citing

Luce, 469 U.S. at 41-42).   Rule 103 does not require a court to

rule on a motion *in limine*.   Wright & Graham, supra, § 5037.18.

## IV.  Discussion

### A.   Mr. Corbett's Qualifications

CFM conceded at oral argument that it does not challenge Mr.

Corbett's qualifications as an expert in the field of

communications regulatory law or FCC matters.   The Court will

presume for purposes of this motion that Mr. Corbett's

specialized knowledge qualifies him to give expert opinions

concerning the FCC.

### B.   Legal Opinion

Though expert testimony is appropriate where "scientific,

technical, or other specialized knowledge will assist the trier

of fact," expert testimony consisting of legal conclusions is

generally inappropriate.   Aquilar v. Int'l Longshoremen's Union

Local #10, 966 F.2d 443,447 (9th Cir. 1992) (upholding district

court's exclusion of expert legal opinion as "utterly

unhelpful").   While expert testimony may be permissible to

describe a complicated agency process, such testimony should not

prescribe legal standards to apply to the facts of the case.

Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 508-09 (2d

Cir. 1977) (permitting expert testimony regarding SEC registration practices but excluding testimony interpreting legal effect of contract terms).

The concerns about admitting expert legal opinion may be lessened where, as here, a court sits as trier of fact. Martin v. Ind. Mich. Power Co., 292 F. Supp. 2d 947, 959 (W.D. Mich. 2002) (concluding that dangers that legal expert testimony presents are "minimal if not nonexistent" where a court is the trier of fact); see also Volk v. United States, 57 F. Supp. 2d 888, 896 (N.D. Cal. 1999) ("[T]he Daubert gatekeeping obligation is less pressing in connection with a bench trial."); Gibbs v. Gibbs, 210 F.3d 491, 500 (5th Cir. 2000) ("Most of the safeguards provided for in Daubert are not as essential in a case such as this where a district judge sits as the trier of fact in place of a jury."). Nevertheless, the trial judge acting as trier of fact has "broad discretion to admit or exclude" expert testimony that is not helpful to its decision. Beech Aircraft Corp. v. United States, 51 F.3d 834, 842 (9th Cir. 1995) (holding that the court properly excluded from a bench trial expert opinion concerning what could be heard in a tape recorded conversation because the trial judge was in a better position to make that determination).

The meaning of federal regulations is a question of law, not a question of fact. Bammerlin v. Navistar Int'l Transp. Corp., 30 F.3d 898, 900 (7th Cir. 1994) (excluding expert testimony regarding compliance with Federal Motor Vehicle Safety Standards); United States v. S. Ind. Gas & Elec. Co., 55 Env't

Rep. Cas. (BNA) 1597, 2002 U.S. Dist. LEXIS 20936, at *23-24

(S.D. Ind. Oct. 24, 2002) (excluding expert testimony

interpreting the Clean Air Act and its accompanying regulations).

One district court has excluded expert testimony reviewing "FCC

rulings and regulations" on the ground that it "usurps the role

of the trial judge in determining the relevant law." <u>TC Systems

Inc. v. Town of Colonie</u>, 213 F. Supp. 2d 171, 182 (N.D.N.Y.

2002).  Noting that a portion of the expert's report "reads more

like a legal brief than an expert opinion," the court refused to

consider it in deciding a motion for summary judgment.  <u>Id.</u>

Though the FCC leaves determination of state-law contractual

rights to the courts, it has exclusive authority over licensing

matters.  <u>Dale J. Parsons, Jr.</u>, 10 FCC Rcd 2718, 2720 (1995);

<u>Arecibo Radio Corp.</u>, 101 F.C.C.2d 545, 548 (1985).

Plaintiff contends that a number of the Report's contentions

are impermissible legal conclusions:

> "Under 47 C.F.R. § 73.3555, Larry Miller's
> Lincoln application is therefore still
> 'pending' at the FCC within the meaning of 47
> C.F.R. § 1.65(a).  Larry Miller may not
> lawfully own attributable ownership interests
> in television stations on both Channel 51 and
> Channel 45 in Lincoln, Nebraska.  Given this
> prohibition, and given Larry Miller's pending
> application for Channel 45 in Lincoln, Larry
> Miller could not, consistent with 47 C.F.R.
> § 73.3518, also propose to acquire and hold a
> second attributable ownership interest in the
> permittee of Channel 51 in Lincoln."
> (Report, at 3-4.)

> "FCC analysis of the issue . . . typically
> focuses on three aspects of broadcast station
> operation: finances, personnel, and
> programming.  Stated most simply, the

1    individual(s) demonstrated to be in control
     of these three aspects of operation are
2    deemed to be in control of a licensed
     station. . . . In my review of the Lincoln 51
3    Application and the Transcript, I evaluated
     evidence that bears on the issue of Carol
4    Miller's deposition that bears on CFM's
     control of CFM and the Lincoln 51
5    Application." (Report, at 4.)

6    "Given the representations and certifications
     made under Carol Miller's signature to the
7    FCC in the Lincoln 51 Application, I reviewed
     the Transcript for evidence that the person
8    represented to be the sole member of the
     limited liability company, who had been
9    solely responsible for all certifications in
     CFM's Lincoln 51 Application, was familiar
10   with basic details concerning the applicant
     and its application." (Report, 6-7)

11

12   "In light of Carol Miller's answers as
     reflected in the Transcript, the multiple
     representations and certifications in the
13   Lincoln 51 Application under Carol Miller's
     signature as CFM's sole member constitute
14   disqualifying misrepresentations under
     relevant FCC case law, of a magnitude
15   sufficient to render CFM unfit to hold any
     FCC license under FCC precedent." (Report,
16   at 10)

17   "In addition to this fundamental overall
     misrepresentation, Carol Miller's testimony
18   indicates that the Lincoln 51 Application
     contains multiple individual false
19   certifications." (Report, at 11)

20   "The applicant, CFM, ultimately must suffer
     the consequences of these stark, intentional
21   misrepresentations, exacerbated by CFM's
     attempt to forestall a [FCC] inquiry by
22   aggressively claiming, in the face of Gray's
     challenge at the FCC, that Carol Miller was
23   in total control of CFM and the Lincoln 51
     Application. [FCC] case law is replete with
24   examples of applicants for FCC authorizations
     who were disqualified on the basis of
25   evidence presented at a hearing similar to or
     even less compelling than that presented
26   here." (Report at 12-13)

10

> "Under this test, CFM's false certifications and misrepresentations in the Lincoln 51 Application are so egregious as to disqualify CFM from becoming the license[e] of Omaha Channel 15." (Report, at 14)

> "The 'total delegation' of authority over CFM's affairs to her husband evident from her deposition testimony in fact constitutes an impermissible abrogation of the complete authority she is held out to the FCC as possessing over CFM." (Report, at 14)

> "The FCC's recent grant of the Lincoln 51 Application calls attention to another issue relating to CFM's basic qualifications to hold an FCC authorization. . . . 47 C.F.R. § 1.65(a) obligated CFM to amend the Lincoln 51 Application as promptly as possible . . . CFM's failure to do so significantly compounded its original infraction by depriving the [FCC] of a full record concerning the Lincoln 51 Application before the FCC acted on May 24, 2005.  The withholding of this material, which has a substantial bearing on the application's bona fides, constitutes a lack of candor and is itself a separate, disqualifying offense under [FCC] precedent." (Report, at 15-16)

The Report does read "like a legal brief" arguing that CFM is not qualified to operate KXVO(TV) under FCC regulations and case law.  Whitney Decl. Ex. A.  The Report features numerous citations to federal court opinions, FCC case law, and the Code of Federal Regulations.  The Report applies a variety of regulatory law to facts concerning CFM, focusing especially on CFM's application (the "Lincoln Application") for FCC consent to transfer Lincoln Broadcasting, LLC, ("Lincoln") and a transcript of the deposition of Carol Miller on April 13, 2005.

In conjunction with its opposition, MTC submitted a Supplement to the Report of Dennis P. Corbett (the "Supplement").

Owdom Decl. Ex. A.  The Supplement, dated September 7, 2005, is based on developments since Mr. Corbett composed the Report.  The Supplement focuses on three letter rulings the FCC has issued regarding a different case concerning CFM.  The first letter ruling of May 24, 2005, ("Letter Ruling I") granted the Lincoln Application to transfer control of Lincoln from World Investments, Inc. ("World") to CFM.  Owdom Decl. Ex. A at 4.  The second letter ruling of June 20, 2005, ("Letter Ruling II") rescinded the consent to transfer that Letter Ruling I had granted.  Owdom Decl. Ex. A at 11.  On August 25, 2005, the FCC issued a third letter ruling ("Letter Ruling III") that required CFM to relinquish control of Lincoln and required World to resume control.  Owdom Decl. Ex. A at 13.

Mr. Corbett opines in the Supplement that the FCC's recision of its grant of consent in Letter Ruling II was "an extraordinary event."  Owdom Decl. Ex. A at 1.  According to the Supplement, "the FCC's actions in Letter Rulings II and II are extremely reliable indicators that the FCC would not approve CFM's acquisition of any broadcast station license, including KXVO(TV), Omaha, Nebraska, without the FCC's first resolving in a manner favorable to CFM, all qualifications issues raised by the transcript."  Owdom Decl. Ex. A at 2.  Mr. Corbett further alleges in the Supplement that Letter Rulings II and III are "extremely reliable indicators of the seriousness with which the FCC regards this matter."  Owdom Decl. Ex. A at 3.  The Supplement concludes that the FCC "is virtually certain to

refrain from granting *any* application that may be filed by CFM to acquire Station KXVO(TV) unless and until the qualifications issues raised by the Transcript are resolved favorably to CFM." Owdom Decl. Ex. A at 3 (emphasis in original; footnote omitted).

In the Supplement, Mr. Corbett does not invoke FCC case law as he did in the Report.  Instead, he substitutes vague assertions of the FCC's "typical" course.  Without citing any authority, the Supplement states that the "far more typical course" is for the FCC to leave initial rulings in place while it considers reconsideration requests and applications for review. Owdom Decl. Ex. A at 2.  Mr. Corbett writes that based on his "opinion and experience" the letter rulings are "reliable indicators" and that the FCC's rescission has been "highly unusual and abrupt."  Owdom Decl. Ex. A at 2.  He bases his certainty of the outcome on the "extraordinary and dramatic action" that the FCC has taken.  Owdom Decl. Ex. A at 2.

To the extent that the Supplement substitutes a vague invocation of "opinion and experience" for legal sources, its admission for the purpose of guessing what the FCC will do next does not become any more appropriate.  Where Mr. Corbett abandons the legal sources that supported the initial Report, his opinion as to the likely outcome becomes mere unsupported speculation. See <u>GE v. Joiner</u>, 522 U.S. 136, 143-47 (U.S. 1997).  A district court may exclude as speculative expert opinion testimony that lacks a reliable basis.  <u>Id.</u> at 146-47.  "Otherwise admissible expert testimony may be excluded under Fed. R. Evid. 403 if its

probative value is substantially outweighed by the danger of
unfair prejudice, confusion of the issues, or undue delay."
United States v. Hoac, 990 F.2d 1099, 1103 (9th Cir. 1993).
Expert testimony may be excluded where it "would inject
collateral matters with weak probative value."  Id.

Mr. Corbett's opinions in the Report and Supplement about
how the FCC will likely apply statutory and case law precedent to
CFM's application, whether based on his interpretations of the
law or his experience, are in any circumstances "utterly
unhelpful" to the Court.  See Aguilar, 966 F.2d at 447.  The
Court is perfectly able to review FCC decisions and regulations
to decide how the law applies to the present facts.  See TC
Systems Inc., 213 F. Supp. 2d at 182.  MTC remains free to use
briefing to persuade the Court that MTC's interpretation of the
law is superior.  To the extent Mr. Corbett's opinions about the
FCC's likely actions rest merely on vague claims regarding his
experience of practicing before the FCC, they amount to mere
speculation.  The ultimate disposition of any legal proceeding is
by nature unpredictable.  The FCC has already once reversed
itself in the case on which Mr. Corbett has based his opinions.
See Owdom Decl. Ex. A at 11.  Mr. Corbett's stated basis for his
opinion is simply that the FCC's actions have been "highly
unusual and abrupt" and "extraordinary and dramatic."  Owdom
Decl. Ex. A at 3.  These cursory descriptions do not meet MTC's
burden to show that Mr. Corbett's opinion about the outcome of
FCC proceedings is reliable.  See Daubert, 509 U.S. at 592 n. 10.

14

1    Mr. Corbett's opinions will not help the trier of fact
2  decide how the FCC would likely decide the propriety of CFM
3  acquiring KXVO.  Mr. Corbett is therefore prohibited from
4  testifying about how FCC law applies to the facts of this case.
5  He is also barred from testifying to any conclusions the basis of
6  which, in whole or in part, is his opinion about the likely
7  outcome of any future decision of the FCC.  The Court hereby
8  excludes opinion testimony concerning, or opinion testimony that
9  has as a premise opinions concerning:

10  •    whether any entity may now or in the future lawfully have an
11       ownership interest in any broadcast station.
12  •    what factors the FCC considers in deciding control of a
13       broadcast station and how such factors apply to this case.
14  •    whether and how any past, present, or future conduct,
15       including but not limited to Carol Miller's deposition and
16       the Lincoln Application, will affect any future FCC
17       decision.
18  •    whether and how any FCC action, including but not limited to
19       letter rulings, indicates its likely decision on any legal
20       issue.
21  •    how the FCC will decide any legal issue.
22  •    any other application of law to the facts of the case.
23       Therefore, with respect to this testimony CFM's motion is
24  GRANTED.
25  ///
26  ///

1        **C.    Relevance**

2        A district court's gatekeeping function requires that it

3   "ensure that the proposed expert testimony is 'relevant to the

4   task at hand,' i.e., that it logically advances a material aspect

5   of the proposing party's case." Daubert v. Merrell Dow Pharms.,

6   43 F.3d 1311, 1315 (9th Cir. 1995) (quoting Daubert, 509 U.S. at

7   597) (internal citation omitted).  The party advancing the expert

8   testimony therefore bears the burden of showing that it is

9   relevant to advancing a claim or defense. Daubert, 509 U.S. at

10  592 n. 10; see Fed. R. Evid. 402; see also Bourjaily, 483 U.S. at

11  175-76.  "'Relevant evidence' means evidence having any tendency

12  to make the existence of any fact that is of consequence to the

13  determination of the action more probable or less probable than

14  it would be without the evidence."  Fed. R. Evid. 401.

15       In determining whether Mr. Corbett can provide relevant

16  opinion testimony, the Court looks to his Report and Supplement.

17  An expert report should contain "a complete statement of all

18  opinions to be expressed and the basis and reasons therefor."

19  Fed. R. Civ. P. 26(a)(2)(B).  The report should "set forth the

20  substance of the direct examination."  Fed. R. Civ. P. 26(a)(2)

21  advisory committee's note to 1993 Amendment.  Federal Rule of

22  Civil Procedure 37(c)(1) automatically excludes from trial any

23  opinions that should have been disclosed in the report but were

24  not, unless the failure to disclose was substantially justified

25  or harmless. Yeti by Molly, Ltd. v. Deckers Outdoor Corp., 259

26  F.3d 1101, 1106 (9th Cir. 2001).

1                        **1.   Unclean Hands Doctrine**

2          One ground that MTC asserts for relevance of Mr. Corbett's

3   testimony is in support of its unclean hands defense to CFM's

4   claim for specific performance.  Def.'s Opp'n at 5.  In support,

5   MTC cites only one case, In re Marriage of Fogarty and Rasbeary,

6   78 Cal. App. 4th 1353, 1366 (2000), for the general rule that "a

7   party requesting equitable relief must come into court with clean

8   hands."  In that case, the ex-husband invoked the defense of

9   laches against a claim brought by his ex-wife for past-due child

10  support payments.  Id.  The ex-husband's failure to pay child

11  support did not bar under the unclean hands doctrine his use of

12  the equitable defense of laches.  Id.  Marriage of Fogarty

13  provides no support to MTC's assertion that Mr. Corbett's expert

14  testimony is relevant to its unclean hands defense.

15         MTC faces two problems in establishing the relevance of Mr.

16  Corbett's testimony to an unclean hands defense.  First, the

17  unclean hands defense only applies to misconduct in the

18  particular transaction or concerning the subject matter of the

19  litigation.  Wilson v. S.L. Rey, Inc., 17 Cal. App. 4th 234, 244

20  (1993) (holding that doctrine of unclean hands barred recovery

21  where evidence showed plaintiff committed waste on land that was

22  the subject of the suit).  Courts should look to how intimately

23  the alleged misconduct relates to the present action: "What is

24  material is not that the plaintiff's hands are dirty, but that he

25  dirtied them in acquiring the right he now asserts, or that the

26  manner of dirtying renders inequitable the assertion of such

                                   17

1  rights against the defendant." Republic Molding Corp. v. B.W.

2  Photo Utilities, 319 F.2d 347, 350 (9th Cir. 1963); see Newman v.

3  Checkrite Cal., 912 F. Supp. 1354, 1376 (E.D. Cal. 1995) (holding

4  that doctrine of unclean hands did not prevent plaintiffs, who

5  had written bad checks for retail purchases, from obtaining

6  equitable relief against defendant collection agencies for

7  improper collection practices).

8      MTC alleges that misconduct in connection with the transfer

9  of a different television station, Channel 51 in Lincoln,

10 Nebraska, bars CFM's claim for specific performance.  Whitney

11 Decl. Ex. A. at 4; Owdom Decl. Ex. A at 1.  MTC does not assert

12 that CFM's purchase of a different television station is part of

13 the same transaction or the same litigation as that involved in

14 this case.  The Supplement does explain how CFM's conduct in

15 other proceedings could affect its future acquisition of

16 KXVO(TV).  Owdom Decl. Ex. A at 3.  Even if the two transactions

17 may affect one another, CFM did not dirty its hands "in acquiring

18 the right [it] now asserts."  See Republic Molding Corp., 319

19 F.2d at 350.  CFM's attempt to acquire Channel 51 appears to be

20 completely unrelated to the contractual rights at issue here

21 regarding KXVO(TV).  Nor has MTC explained how in any other way

22 "the manner of dirtying renders inequitable the assertion of"

23 CFM's contractual rights.  See id.

24      The second hurdle that MTC faces is that an unclean hands

25 defense is appropriate only where the alleged misconduct, if

26 unchecked, would have prejudiced the other party.  Soon v.

18

1  <u>Beckman</u>, 234 Cal. App. 2d 33, 36 (1965).  For the doctrine to

2  apply, the "'conduct must be so intimately connected to the

3  injury of another with the matter for which he seeks relief, as

4  to make it inequitable to accord him such relief. It must have

5  been conduct which, if permitted, inequitably affects the

6  relationship between the plaintiff and the defendant, . . .'"

7  <u>Estate of Blanco</u>, 86 Cal. App. 3d 826, 833 (1978) (quoting

8  <u>Bradley Co. v. Bradley</u>, 165 Cal. 237, 242 (1913)).  In <u>Pleasant</u>

9  <u>Valley Canal Co. v. Borror</u>, 61 Cal. App. 4th 742 (1998), the

10 court addressed the effect of a plaintiff's past submission of

11 untruthful information to a government agency.  <u>Id.</u> at 785 n. 31.

12 The case concerned the parties' respective riparian rights and

13 depended in part upon plaintiff's allegedly inflated reports to

14 the state regarding its water use.  <u>Id.</u>  Acknowledging

15 defendant's assertions that plaintiff was "fully clothed in bad

16 faith and inequitable conduct," the court nevertheless refused to

17 apply the unclean hands doctrine where defendant had not been

18 prejudiced by any alleged improper reporting practices.  <u>Id.</u>

19 (citing <u>Soon</u>, 234 Cal. App. 2d at 36).

20     MTC asserts that if the Court orders specific performance,

21 it will be "required to join with CFM in an application that

22 would be filed with the FCC in which MTC would be requesting the

23 consent of the FCC to transfer the license for Station KXVO in

24 Omaha, Nebraska, from MTC to CFM."  Def.'s Opp'n at 2-3.  For the

25 first time at oral argument, MTC argued that it would be

26 prejudiced by a decree of specific performance because any

application would be held "in limbo."  MTC also claimed that a

decree of specific performance, combined with FCC's denial of

CFM's licence, would be prejudicial because it would require more

litigation in this Court.

In any event, it appears that courts are free to resolve

issues of state law prior to an FCC licensing inquiry.  <u>Radio

Station WOW, Inc. v. Johnson</u>, 326 U.S. 120, 131-32 (1945)

(recognizing the power of the states to resolve issues of fraud

concerning FCC-licensed facilities); <u>see also</u> <u>Minn.-Iowa

Television Co. v. Watonwan T.V. Improvement Ass'n</u>, 294 N.W.2d

297, 305 (Minn. 1980) (holding that FCC's opposition to a

contract provision did not bar the enforcement of the contract

under state law).  A district court deciding a case similar to

this one awarded specific performance under an option contract

despite uncertainty about the likelihood of FCC approval.  <u>Media

Gen. Broad. of S.C. Holdings, Inc. v. Pappas Telecasting of the

Carolinas</u>, 152 F. Supp. 2d 865, 868 (W.D.N.C. 2001).  The court

entered judgment requiring defendant to file FCC documents for

transfer pursuant to the option.  <u>Id.</u>  Acknowledging defendants'

assertion that the FCC would not approve the sale, the court

granted specific performance and noted that it would "revisit the

question of remedies if the FCC blocks said sale."  <u>Id.</u>

Accordingly, the Court is unable to discern how Mr.

Corbett's testimony could be relevant to an unclean hands

defense.  Divining the outcome of FCC proceedings or interpreting

the law that applies to such actions cannot establish that

20

specific performance is barred by the doctrine of unclean hands.
The Court can grant specific performance regardless of the FCC's
predisposition toward CFM's alleged misconduct or any other
licensing issues.  Nevertheless, because the merits of the
unclean hands defense were not fully briefed in the context of
this motion, the Court declines at this time to exclude on this
ground any of Mr. Corbett's testimony.

### 2.   Superiority of Specific Performance

A second ground of relevance MTC asserts is that Mr.
Corbett's testimony is relevant to the Court's determination of
whether specific performance is the superior remedy.  Specific
performance is a discretionary remedy.  <u>Petersen v. Hartell</u>, 40
Cal. 3d 102, 110 (1985).  Specific performance may be refused
where granting it would cause "unreasonable hardship or loss to
the party in breach or to third persons."  Restatement (Second)
of Contracts § 364 (1981); <u>see</u> Cal. Civ. Code § 3391 ("Specific
performance cannot be enforced against a party to a contract . .
. [i]f it is not, as to him, just and reasonable . . ."); <u>United
States v. Georgia-Pacific Co.</u>, 421 F.2d 92, 104 (9th Cir. 1970)
("Courts of equity have long refused to decree specific
performance where the result would be unconscionable, unjust,
inequitable, oppressive or unduly harsh."); <u>Blackburn v.
Charnley</u>, 117 Cal. App. 4th 758, 765 (2004) (upholding trial
court grant of specific performance based on balancing the
hardships of enforcement).

It is not, at this point, clear what factors will be

relevant to determine whether to grant specific performance.
MTC's claims that it will be prejudiced by being held "in limbo"
pending a licensing decision or by being compelled to engage in
further litigation following the denial of a license may impact a
remedial decision of the Court.

The Court's decision does not preclude Mr. Corbett from
giving nonopinion testimony or from giving relevant nonlegal
opinion testimony disclosed in the Report and Supplement.  Where
complex administrative processes are at issue, expert testimony
can be helpful to explain them to the trier of fact.  See Marx,
550 F.2d at 508-09 (2d Cir. 1977).  In Marx, the court excluded
expert testimony about whether a party's conduct violated a term
of a contract regarding the registration of stock.  Id. at 509.
The court decided, however, that the expert in securities
regulation "was competent to explain to the jury the step-by-step
practices ordinarily followed by lawyers and corporations in
shepherding a registration statement through the SEC."  Id. at
508-09; see also TC Systems Inc., 213 F. Supp. 2d at 182
(excluding portions of expert report regarding the FCC that read
"like a legal brief" but declining to exclude the expert's
testimony at trial if the party could establish "a nexus between
the FCC criteria and the facts here").

Testimony about the process of obtaining FCC approval may
prove relevant to a decision about whether to award specific
performance.  Though the Court is capable of applying FCC law to
any relevant facts, Mr. Corbett may give relevant expert

testimony regarding the nature of FCC procedures and practices apart from the law that underlies them.  Such testimony could be factual or could be in the form of any nonlegal opinion that he has already disclosed in the Report and Supplement.  The Court is not in a position to determine at this stage whether MTC can establish a relevant "nexus" between Mr. Corbett's testimony and this case.  Excluding all of Mr. Corbett's testimony on a relevance ground is therefore premature.

**ACCORDINGLY:**

1.   Plaintiff's motion to exclude Mr. Corbett's opinion testimony concerning the following subjects is GRANTED:

    a.   whether any entity may now or in the future lawfully have an ownership interest in any broadcast station.

    b.   what factors the FCC considers in deciding control of a broadcast station and how such factors apply to this case.

    c.   whether and how any past, present, or future conduct, including but not limited to Carol Miller's deposition and the Lincoln Application, will affect any future FCC decision.

    d.   whether and how any FCC action, including but not limited to letter rulings, indicates its likely decision on any legal issue.

    e.   how the FCC will decide any legal issue.

    f.   any other application of law to the facts of the case.

///

2.    Plaintiff's motion to exclude the remainder of Mr.
      Corbett's testimony is DENIED.

3.    Plaintiff's motion to strike Mr. Corbett's designation as an
      expert and to strike his expert report is DENIED.

IT IS SO ORDERED.

**Dated:  October 11, 2005**              **/s/ Robert E. Coyle**
810ha4                          UNITED STATES DISTRICT JUDGE